# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER E. HANEY, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 16-6186 |
| | : | |
| MEGAN J. BRENNAN, et al., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                                                       **July 31, 2019**

Plaintiff Christopher Haney lost his position as a career postal carrier for the United States Postal Service ("USPS") after he dropped out of its Postal Police training program. Plaintiff has filed suit against Defendants USPS and the Postmaster General, alleging employment discrimination based on race and gender, breach of contract, violation of due process, retaliation, and negligent misrepresentation. Defendants have moved for summary judgment. For the reasons that follow, the motion will be granted.

**I.     FACTS**

Except where noted, the relevant facts are undisputed. Where there are disputes, the facts are viewed in the light most favorable to Plaintiff as the non-moving party.

Plaintiff Christopher Haney worked for USPS for seventeen years, becoming a career City Carrier at the Sharon Hill, PA Post Office ("Sharon Hill PO"). In the fall of 2015, he became interested in applying to a Postal Police position with USPS's Inspection Service. Before applying, Plaintiff alleges that he spoke to his supervisor and the local Union about

returning to his career position if he did not complete the training program, and was told that he could.[1]

On November 13, 2015, Plaintiff signed a Memorandum of Understanding ("MOU") as part of his formal application to the Postal Police.[2] The MOU contained provisions that detailed USPS's policy that there was no right to return to a former position.[3] On January 9, 2016, he began the Postal Police Officer Basic Training ("PPOBT") program in Potomac, Maryland.

A few weeks later, Plaintiff decided to leave the PPOBT program. He alleges he spoke to his former supervisor at Sharon Hill, to his local union, and to a district-level staffing coordinator, who all told him that he could return to his former position.[4] On February 5, 2016, Plaintiff resigned from the Postal Police by signing a resignation letter addressed to Nichole Cooper, Inspector-in-Charge ("INC") of the PPOBT program.[5] The letter stated that Plaintiff was voluntarily resigning "because [he had] been offered a position with another company."[6]

---

[1] Pl.'s Opp. [Doc. No. 64-3] at 5.

[2] Def.'s Reply [Doc. No. 67-2] Ex. C.

[3] *Id.* The MOU provides in relevant provisions that:

> …after reassignment as a PPO, an officer has no retreat rights back to their former position in the event of failure in Basic Training or failure to complete the PPO probationary period.
> …
> Applicants should understand that if they fail to successfully complete PPOBT that the Inspection Service has no obligation to assist them in returning to any position in the Postal Service; and that they may be discharged from the Postal Service.
> …
> I further acknowledge that this memorandum comprises the entire agreement between me and the US Postal Inspection Service, and that it supersedes any representations that may have been made in connection with my selection, training, or employment.

*Id.*

[4] Pl.'s Opp. [Doc. No. 64-3] at 5-6. Plaintiff further alleges that the staffing coordinator (termed a "Complement Coordinator") consulted with other administrators and human relations specialists when advising him. *Id.*

[5] Def.'s Reply [Doc. No. 67-2] Ex. L. The letter was drafted in consultation with Assistant Inspector-in-Charge (AIC) Jennifer McDaniel, who reports directly to Cooper. Def.'s Reply (McDaniel Decl.) [Doc. No. 67-2] Ex. G.

[6] The resignation letter stated in full: "This letter serves as notice that effective February 5, 2016, I am voluntarily resigning from the Postal Police Officer Basic Training Program (PPOBT 2016-01). I am resigning because I have been offered a position with another company." Def.'s Reply [Doc. No. 67-2] Ex. L.

That day, Cooper sent an email to other Inspection Service staff stating that Plaintiff was resigning because "he was offered a position with his uncle's trucking company. He plans to go back to his former postal position and stated they are aware of his pending job offer."[7]

Defendants assert that Plaintiff planned to return to his former position only temporarily before beginning the trucking job.[8] Plaintiff acknowledges that he mentioned working for a private trucking company, but argues that he told Defendants it was a part-time night job, and that he has no relative in the trucking business.[9] Plaintiff further contends that the resignation letter was prepared by the Assistant INC and that he was "told he had to sign it to resign" from the Postal Police.[10] After his resignation from the Postal Police on February 5, Plaintiff used vacation time which he previously accrued as a career City Carrier and then temporarily returned to work at the Sharon Hill PO on February 16, 2016.[11]

### A. Investigation by Barber ultimately leads to termination.

Within a few days of Plaintiff's return to work at the Sharon Hill PO, Karen Barber, a USPS area-level labor relations manager, began an investigation into Plaintiff's employment status.[12] Defendants argue that the labor relations department's investigation of Plaintiff's employment status was triggered by a payroll issue soon after he returned to work at the Sharon Hill PO.[13] Plaintiff alleges that the investigation was not triggered by a payroll issue, but rather

---

[7] Def.'s Reply [Doc. No. 67-2] Ex. N.

[8] Def.'s Reply [Doc. No. 67] at 3-4.

[9] Pl.'s Opp. [Doc. No. 64-3] at 9.

[10] *Id.*

[11] Def.'s Reply (Killen's Decl.) [Doc. No. 67-2] Ex. 3.

[12] Def.'s Reply [Doc. No. 67] at 5. USPS is a national entity that is broken down into areas, and then districts, and then offices.

[13] Def.'s Reply (Killen's Decl.) [Doc. No. 67-2] Ex. 3.

3

by confusion over the no-return policy and Plaintiff's employment status.[14] On February 22, 2016, Barber sent the following email to staffing coordinator Debra Mills, stating in relevant part:

> I have been trying to get an understanding of what transpired at the PPO training, and if there was any paperwork signed when Haney dropped out of the training and was told he could return to his carrier position. We have not been able to find any written directions to him but again, the fact remains that he has been delivering mail since February 13th.
>
> If all the information I have heard today bears out then:
>
> Since he was given faulty information, it may be prudent to allow him to return to the carrier craft (with a non precedent setting agreement from the [Union]) or make some arrangements for him to return to the Police Academy and complete the training. I could predict that the PPO would file a grievance that he was given the faulty information which influenced his decision to drop out of the Police Academy. At this moment he does indeed have a FORM 50 which lists him as reassigned to the PPO.
>
> Alan Moore communicated with me and said that he asked that you advise me to get concurrence on the employee returning to the city carrier craft from the local union and local management. He said that upon receiving that he will go the national union.
>
> So therefore I am going to get the statements from local management and from the union and provide that information to Alan.[15]

The next day, on February 23, district-level labor relations specialist Michael Farber spoke with the local Union President Rhonda Massari by telephone. Later that day, he updated Barber that Massari was "agreeable to [the] concurrence, which [Faber] advised would need to be in writing."[16] That same day, Barber learned of INC Cooper's email attributing Plaintiff's choice to resign to a pending private job offer.[17] Barber then emailed her findings to Alan

---

[14] Pl.'s Opp. [Doc. No. 64-3] at 10-11.

[15] Pl.'s Ex. [Doc. No. 65] at 10. Alan Moore is labor relations manager at USPS National Headquarters.

[16] Pl.'s Ex. [Doc. No. 65] at 11.

[17] Pl.'s Ex. [Doc. No. 65] at 7.

Moore at USPS National Headquarters and stated, "With this new information, I do not think we should pursue any exception for him to be returned to the carrier craft…"[18]

Barber then notified Plaintiff's supervisor that no exception would be pursued and that Plaintiff should stop working that day.[19] After he was told to stop working, Plaintiff unsuccessfully sought help from his Union in reclaiming his former career position.[20] On March 2, 2016, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), reporting discrimination based on sex and race.[21] On March 11, 2016, the Postal Service formally terminated Plaintiff from his career position.

### B.  Rehiring to another Post Office, recoupment, and grievances.

In April 2016, Plaintiff began a new, non-career postal City Carrier position at the West Chester Post Office, with loss of the benefits and seniority that he formerly enjoyed in his career position at USPS.[22] In early June 2016, USPS financial specialist Mark Killen received an alert that Plaintiff had overdrawn 98.16 hours of annual leave at the time of his termination on March 11, and Killen initiated the recoupment process by contacting Plaintiff's supervisor at West Chester.[23] Defendants allege that the alert was automatically triggered because Plaintiff lost the

---

[18] Def.'s Reply [Doc. No. 67-2] Ex. 2.

[19] Pl.'s Ex. [Doc. No. 65] at 3. Faber promptly emailed local Union President Massari that the exception would not be pursued:

> During our telephone call yesterday, I did indicate that this situation could be resolved by way of a written concurrence between local Management and the local Union to allow Mr. Haney to return to Sharon Hill PO in his capacity; however, that was prior to Management becoming aware of Mr. Haney's written resignation from the Postal Police Academy. As such, it is Management's position that Mr. Haney's written resignation is binding in this situation.

*Id.* at 7.

[20] Pl.'s Opp. [Doc. No. 64-3] at 8.

[21] *Id.* at 12.

[22] *Id.* at 7.

[23] Def.'s Reply, Ex. 3 (Killen Decl.) [Doc. No. 67-2] ¶6.

5

amount of leave entitled to a career City Carrier when he left that position to join the Postal Police.[24] Defendants further allege that when Plaintiff filed a Union grievance over the debt, recoupment was stalled until the grievance was resolved.[25]

Upon resolution of the debt grievance in fall 2016, USPS resumed recoupment and Plaintiff entered into a voluntary installment plan to pay approximately $2,000.[26] Plaintiff alleges that around this time, Killen agreed to forgo recoupment until the resolution of this litigation,[27] but Defendants dispute this.[28] Plaintiff further alleges that despite the installment plan, USPS recouped the entire amount in one lump sum.[29] Defendants strongly disagree that the debt was recouped in lump sum form.[30]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it could affect the outcome of the suit, given the applicable substantive law, and a dispute is *genuine* if the evidence presented is such that a reasonable jury could return a verdict for the nonmoving party.[31]

---

[24] Def.'s Reply [Doc. No. 67] at 8.

[25] *Id.* at 8-9; Def.'s Reply, Ex. 3 (Killen Decl.) [Doc. No. 67-2] ¶¶11-12.

[26] Def.'s Reply [Doc. No. 67] at 9; Pl. Sur-Reply [Doc. No. 69] at 10.

[27] Pl.'s Opp. [Doc. No. 64-3] at 16.

[28] Def.'s Reply [Doc. No. 67] at 9.

[29] Pl.'s Opp. [Doc. No. 64-3] at 16 ("…that USPS recouped the entire amount despite an agreement between USPS and his attorney to defer the claim…"); Pl.'s Sur-Reply [Doc. No. 69] at 10.

[30] Def.'s Sur-Reply [Doc. No. 70] at 3.

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[32] Further, a court may not weigh the evidence or make credibility determinations.[33] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[34] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[35] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[36] Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate.[37]

## III. DISCUSSION

### A. Discrimination Claim

Without direct evidence, Plaintiff's discrimination claim must be analyzed under the burden-shifting framework established in *McDonell Douglas v. Green*.[38] Under this framework, a plaintiff must establish a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class, (2) he was qualified for the position, and (3) he suffered an adverse employment action (4) in circumstances giving rise to an inference of discriminatory motive.[39]

---

[32] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[33] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[34] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[35] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[36] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

[37] *Wisniewski v. Johns—Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[38] 411 U.S. 792 (2003).

[39] *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005).

If the plaintiff can establish a *prima facie* case of discrimination, the burden shifts to the defendant to demonstrate a legitimate, nondiscriminatory basis for the adverse employment action.[40]

If the defendant establishes a legitimate nondiscriminatory basis for termination, then the burden shifts back to the plaintiff to demonstrate, through direct or circumstantial evidence, that the asserted nondiscriminatory basis is merely a pretext for discrimination.[41] To prove that the proffered nondiscriminatory basis was merely a pretext, a plaintiff must point to evidence that either "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."[42]

### 1. Plaintiff's *prima facie* case.

There is no dispute, for purposes of the motion, that Plaintiff can meet the first three elements of a *prima facie* case. To show discriminatory motive, Plaintiff has submitted evidence that two other postal employees were similarly situated to him but were treated more favorably, which he suggests was because of race or gender. Such comparator evidence may be used to show discrimination.[43] However, Defendants argue that the two people in question are not appropriate comparators.

---

[40] *Id.*

[41] *Id.*

[42] *Fuentes v. Perskie*, 32 F.3d 759, 761 (3d Cir. 1994).

[43] *Glass v. First Judicial District*, 734 F. App'x 136, 139-40 (3d Cir. 2018).

A proper comparator is one who is similarly situated in "all relevant respects."[44] "Which factors are relevant is determined by the context of each case, but often include a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."[45]

The first proposed comparator is Robert Chavis, a City Carrier at the Sharon Hill Post Office who is of a different race than Plaintiff.[46] Chavis is not an appropriate comparator because he did not leave his carrier position and did not join the Postal Police. Instead, he received 204(b) supervisor training concurrent with his carrier duties in 2011, and therefore was not similarly situated to Plaintiff.[47] Thus, Plaintiff has not established a *prima facie* case of racial discrimination.

The second proposed comparator is Jennifer Marquardt, a City Carrier in the same district as Plaintiff whom Plaintiff alleges was treated more favorably because of her gender. On March 8, 2014, Marquardt left her position to begin training as a Postal Police officer.[48] On April 3, 2014, Marquardt voluntarily resigned from the PPOBT program and returned to her former carrier position.[49] In her resignation letter, Marquardt wrote that she was "resigning for personal reasons and [had] sought out [her] previous position with the United States Postal Service."[50]

---

[44] *Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (internal quotation marks omitted).

[45] *Id.* at 223 (internal quotation marks and citations omitted).

[46] Pl.'s Opp. [Doc. No. 64-3] at 7.

[47] Def.'s Reply [Doc. No. 67-2] Ex. W.

[48] Def.'s Reply [Doc. No. 67-2] Ex. V.

[49] Def.'s Reply [Doc. No. 67-2] Ex. U.

[50] *Id.*

9

Defendants argue that Marquardt's stated reason for resigning – that she wished to return to her carrier position – makes her inappropriate as a comparator because they believed that Plaintiff resigned to take a job with a private company, because the circumstances of her reassignment were different, and because the decision-maker was different.[51]

The Court agrees that the comparator evidence as to Marquardt is thin, as the circumstances differed somewhat, and the decision-makers were different. However, "[t]he Supreme Court has held that evidence offered in a discrimination case concerning purported comparators with different supervisors is neither per se admissible nor per se inadmissible."[52] Bearing in mind that the *prima facie* burden is not intended to be onerous, the Court will assume for purposes of summary judgment that Plaintiff has produced some comparative evidence indicative of bias based on gender.[53]

### 2. Defendants have met their burden of showing a non-discriminatory reason.

Assuming that Plaintiff has met his *prima facie* burden as to gender discrimination, Defendants have offered as a non-discriminatory reason for termination that Barber and other USPS labor relations management reasonably believed that Plaintiff had resigned and that he was planning to take a job with a private company. As discussed above, emails written by Barber at the time of her decision show that she was not opposed to Plaintiff's return until she learned that his resignation letter stated that he was pursuing employment outside of the USPS. Defendants therefore have produced evidence of a nondiscriminatory basis for the action.

---

[51] Def.'s Reply [Doc. No. 67] at 8.

[52] *Opsatnik*, 335 F. App'x at 223 (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379 (2008)).

[53] *Rosencranz v. Quixote Enterprises, Inc.*, 755 F. App'x 139, 142 (3d Cir. 2019) (citations omitted).

### 3. Plaintiff has not met his burden of showing that Defendants' proffered nondiscriminatory reason was pretextual.

Plaintiff argues that Barber knew that the comparator, Marquardt, had been allowed to return in 2014, and that the resignation issue was a smokescreen for treating Plaintiff differently based on his gender. However, Barber states in her declaration that she only learned about Marquardt after Plaintiff filed his EEOC grievance on March 2, 2016, in which he claimed Marquardt as a comparator, and Plaintiff has offered no evidence to contradict her statement.[54] Plaintiff also argues that Barber failed to remove Marquardt once she learned of the situation, but Barber's failure to take action against Marquardt in 2016 does not give rise to an inference of discrimination, as the decision not to remove someone two years after her return is not comparable to Plaintiff's situation, where the decision occurred over a few weeks.

Plaintiff also argues that Barber did not see Plaintiff's resignation letter until February 24, 2016, after Plaintiff was told to stop working, but as set forth above, Barber saw INC Cooper's email detailing the resignation on February 23. Plaintiff next disputes the accuracy of the resignation letter he signed because he did not intend to leave the Postal Service altogether, and because he never said he was going to work for a relative's trucking company.[55] However, Plaintiff has not produced evidence from which a reasonable jury could conclude that Barber did not rely on what she had been told. Plaintiff has offered evidence that INC Cooper may have been mistaken about Plaintiff's reason for leaving the PPOBT program, but the material issue is whether Barber's true reasoning was discriminatory, not whether she relied on flawed

---

[54] Def.'s Reply, Ex. 2 (Barber Decl.) [Doc. No. 67-2] ¶12.
[55] *Id.*

information.[56]  Because Plaintiff has not shown a basis for calling into doubt Barber's stated reasons, Plaintiff cannot prevail on his claims of race and gender discrimination.

### B.     Breach of Contract Claim

#### 1.     Title VII would not preempt the contract claim.

Defendants assert that Plaintiff's breach of contract claim is preempted by Title VII because it has the same nexus of facts as the discrimination claim.[57]  A claim is preempted where it arises from the same set of facts and provides for a consistent theory of relief with the discrimination claim.[58]

Here, Plaintiff's breach of contract claim does not rest on the same legal theory as the discrimination claim.  Although there is some overlap in the facts underlying the two claims, they rest on separate premises.  To support his breach of contract claim, Plaintiff alleges that he asked his local Union to speak to USPS on his behalf to find a way to allow him to return to his career City Carrier position.[59]  He has further presented evidence of an email sent after a discussion between the local Union President and USPS, which he alleges represents a reduction to writing of an oral agreement.[60]  These facts do not depend upon a showing of discrimination, and Plaintiff's contract claim is therefore not preempted by Title VII.

---

[56] *Fuentes*, 32 F.3d at 765.

[57] Def.'s Reply [Doc. No. 67] at 19 (citing *Gurchensky v. Potter*, No. 06-5760, 2010 WL 2292171 (D.N.J. May 28, 2010); *Blizter v. Potter*, No. 03-6124, 2005 WL 1107064 (S.D.N.Y. May 6, 2005); *Mathis v. Henderson*, 243 F.3d 446 (8th Cir. 2001)).

[58] *Gurchensky*, 2010 WL 2292171, at *6; *Shaffer v. Peake*, No. 07-298, 2008 WL 794470, at *18 (W.D. Pa. Mar. 24, 2008).

[59] Pl.'s Opp. [Doc. No. 64-3] at 17.

[60] *Id.*

### 2. The Tucker Act does not bar implied contracts.

Defendants next argue that any agreement between the Union and USPS, if it existed, would be barred under the Tucker Act because it would not be an express contract. The Tucker Act permits contractual claims against the government for "any express *or implied* contract with the United States."[61] Plaintiff has alleged that the agreement was an "implied contract promissory estoppel claim."[62] If such an agreement existed, a contract claim arising from that agreement would not necessarily be barred by the Tucker Act.[63]

### 3. Plaintiff cannot show the existence of a contract.

Plaintiff's breach of contract claim is based on an alleged agreement between the local Union and local management to allow Plaintiff to return. Defendants deny that an agreement was made. Plaintiff bases his claim on an email from USPS labor specialist Michael Faber on February 23, memorializing a telephone discussion with local Union President Rhonda Massari.[64] The email stated that Massari was "agreeable to a concurrence, which [Faber] advised would need to be in writing."[65] Plaintiff characterizes the content of the email as "they were waiting for local Union President (Rhonda Massari) to return from a conference to reduce the agreement to writing."[66]

---

[61] 28 U.S.C. § 1491(a)(1) (emphasis added).

[62] Pl.'s Opp. [Doc. No. 64-3] at 16.

[63] Although contract suits against the United States usually must be brought in the Court of Federal Claims under 28 U.S.C. 1491, claims against the USPS may be brought in the appropriate district court. *See Licata v. United States Postal Service*, 33 F.3d 259 (3d Cir. 1994) (holding that the Tucker Act does not deprive district courts of subject matter jurisdiction over suits against USPS). *Licata* also explores the effect of the Postal Reorganization Act, 39 U.S.C. §409(a), and characterizes §409(a) as creating an "unusual" position for the Postal Service in which it can be sued on contract claims in courts other than the Court of Federal Claims. *Id.* at 263-64.

[64] Pl.'s Exs. [Doc. No. 65] at 11.

[65] *Id.*

[66] Pl.'s Opp. [Doc. No. 64-3] at 8.

However, the next day Faber emailed Massari to explain that a written concurrence was no longer useful because Barber had learned that Plaintiff formally resigned.[67] Internal emails from within USPS state that only Alan Moore, Manager of Labor Relations for USPS National Headquarters, could "present for any exception" to the no-return policy.[68] The emails demonstrate that USPS's internal procedure for an exception required obtaining a written concurrence from local union and local management, which would then be brought by Moore to the Union Headquarters to make an agreement.[69]

Defendants argue that there was no agreement between the local Union and USPS to allow Plaintiff to return to his position. The evidence supports their claim that a local union representative would not have had the authority to bind the USPS in this context, because such an agreement could only be made with the national branch of the Union. Defendants also argue that the emails demonstrate that management (Barber, Mills, and Moore) were still contemplating whether to make the exception, and there was no offer or agreement.

Construing this evidence in the light most favorable to Plaintiff, there is insufficient evidence to support a finding that a contract existed between local Union and local management. Any agreement had not been finalized, and could not be finalized without approval at the national level. Given these facts, a reasonable jury could not find that Faber's phone call with Massari amounted to a contract to allow Plaintiff to return to his former position. Therefore, there is no genuine dispute regarding whether the contract existed; it did not, and summary judgment will be granted to Defendants on this claim.

---

[67] *Id.*

[68] Pl.'s Exs. [Doc. No. 65] at 12.

[69] *Id.* at 10, 12 ("The NALC at HQ must be in agreement and that is Alan's to present for any exception. He is probably lucky it is a carrier and not a clerk, because they said no to one in Calif[.] last year.").

### C. Negligent Misrepresentation Claim

The Federal Torts Claim Act ("FTCA") waives sovereign immunity and confers subject matter jurisdiction upon federal district courts for certain torts, but with express exceptions.[70] Misrepresentation is one of these exceptions for which sovereign immunity bars claims.[71] "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies."[72] Plaintiff has asserted that he was injured when he was misinformed that he could return to his Carrier position.[73] The alleged negligence claimed by Plaintiff must be viewed as a claim rooted in misrepresentation that cannot be pursued under the FTCA.[74] Summary judgment will be granted to Defendants on the claim of negligent misrepresentation.

### D. Due Process Claim

Defendants argue that Plaintiff has failed to provide evidence to support his claim that they did not afford him an adequate opportunity to grieve the vacation pay recoupment in violation of his right to due process under the Fifth Amendment to the United States Constitution. Defendants have offered evidence that Plaintiff had access to the grievance process and made full and complete use of it.[75] Recoupment was delayed as a matter of policy while Plaintiff engaged in a two-level grievance process.[76] Plaintiff does not argue that the multi-level

---

[70] 28 U.S.C. § 2680.

[71] 28 U.S.C. § 2680(h).

[72] *Block v. Neal*, 460 U.S. 289, 296 (1983).

[73] Pl.'s Opp. [Doc. No. 64-3] at 21 ("So the USPS did not tell the truth upfront, watered down the consequences of applying for its own interest and not that of its employees.").

[74] *See Shaw v. United States Postal Serv.*, No. 18-651, 2019 WL 5885900, at *3 (E.D. Pa. Nov. 09, 2018).

[75] Def.'s Reply [Doc. No. 67] at 22 ("Not only did Haney have an opportunity to grieve the repayment of debt issue, but he engaged in a multi-step grievance process over the course of a *two month period* that resulted in a Step B decision issued on September 7, 2016.").

[76] *Id.*

grievance process was insufficient to constitute the "notice and hearing" owed, and he has not shown that he was entitled to any further process.[77]

Instead, Plaintiff argues that because Defendants assert that Plaintiff was not represented by the Union during the period when he took his vacation leave, the grievance process pursuant to the Union's collective bargaining agreement was inadequate or inapplicable.[78] However, the wage recoupment process was initiated after Plaintiff was rehired as a City Carrier and once again represented by the Union. Regardless of Plaintiff's status at the time he took his leave, the process due to him during the wage recoupment procedure was the very grievance process in which he engaged. Summary judgment will therefore be granted to Defendants on the claim.

### E. Retaliation Claim

Both parties acknowledge that Defendants initiated the vacation pay recoupment after Plaintiff filed a discrimination claim with the EEOC. And both parties acknowledge that Plaintiff entered into a voluntary installment plan to pay off the debt, after his debt collection grievance was resolved against him. Beyond these two points of agreement, the parties part ways.

Plaintiff asserts that Defendants initiated the recoupment process in retaliation for the grievance. Specifically, Plaintiff alleges that USPS collected the debt in a lump sum despite a voluntary installment plan in place to pay the debt. Defendants strongly disagree. Defendants allege that recoupment was automatically triggered and that the financial specialist Killen, unaware of the EEOC proceeding, initiated the recoupment process. They also contend that

---

[77] To support his assertion, Plaintiff cites to "*Hatahly v. U.S.*, 247 F2d 819, 824-25 (3rd Cir. 1995)." Pl.'s Opp. [Doc. No. 64-3] at 18. This case does not appear to exist. There is a case, *United States v. Hatahley*, 351 U.S. 173 (1956), which is a United States Supreme Court decision arising from the Tenth Circuit, and which does not relate to Plaintiff's due process argument.

[78] Pl.'s Sur-Reply [Doc. No. 69] at 10-11.

16

there was no lump sum collection, and that Plaintiff has merely asserted this fact without evidence.

Whether such a lump sum payment occurred is disputed, but is not material to the claim of retaliation. The material disputes are whether recoupment was triggered because of the discrimination grievance, whether Killen knew of the discrimination grievance when he initiated recoupment, or whether another directed Killen to do so. Defendants have presented Killen's declaration that the recoupment process is triggered automatically, that Killen initiated the recoupment process in the ordinary course of his role and not at specific direction, and that Killen was unaware of the discrimination grievance.[79] Because Plaintiff has not offered evidence to contradict these facts beyond bare assertions, summary judgment will be granted to Defendants on the retaliation claim.

## IV. CONCLUSION

Plaintiff has produced evidence that there may have been flaws in the processes by which his career position was terminated and vacation pay recouped, but has not shown that the decisions were animated by a discriminatory or retaliatory motive. Nor could a reasonable fact-finder conclude that a contract existed, or that he did not receive due process. Finally, Plaintiff cannot assert a claim under the FTCA for misrepresentation. Defendant's motion for summary judgment will be granted as to all claims. An order will be entered.

---

[79] Def.'s Reply [Doc. No. 67] at 8-9; Def.'s Reply, Ex. 3 (Killen Decl.) [Doc. No. 67-2] ¶¶ 4, 6, 13.